UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND, ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  19-cr-40034-SLD |
| | ) | |
| TRISTAN SCOTT BLANK, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S COMMENTARY ON SENTENCING FACTORS**

Defendant, Tristan Scott Blank, through his attorney, files his Commentary on

Sentencing Factors.

Tristan Blank grew up with a secret. He was gay. That was not acceptable in

Tristan's world. For Tristan, being gay meant he was a sinner damned to hell. He was a

"maggot" and a "faggot." That is not hyperbole. That was Tristan's life.

Tristan's family belonged to the First Baptist Church in Geneseo, Illinois. That

Church's Statement of Faith has 13 "Sections." Here are Sections 12 and 13:

> Section 12: Of Separation and Current Issue: "We take a stand against all
> forms of compromise to the Word of God; we stand against abortion, since
> life begins at conception; we stand against the consumption of alcohol; we
> oppose any sexual activity outside of marriage; we strongly condemn any
> form of homosexuality, fornication, adultery, and pornography; we
> oppose the New Age philosophies. We believe that all the saved should
> live in such a manner as not to bring reproach upon their Savior and Lord;
> and, that separation from all religious apostasy, all worldly and sinful
> pleasures, practices, and associations is commanded of God.

> This statement of Faith and Practice is not meant to be complete but rather
> to illustrate the direction that this church has taken in establishing a
> Scriptural direction.

> Section 13: Human Sexuality: "We believe that God has commanded that
> no intimate sexual activity be engaged in outside of a marriage between
> one naturally-born man and naturally-born woman. We believe that any
> form of homosexuality, lesbianism, bisexuality, bestiality, incest,
> fornication, adultery, and pornography are sinful perversions of God's gift
> of sex. We believe that God disapproves of and forbids any attempt to
> alter one's gender by surgery or appearance (Gen. 2:24; Gen. 19:5,13; Gen.
> 26:8,9; Lev. 18:1-30; Rom. 1:26-29; I Cor. 5:1, 6:9; I Thess. 4:1-8; Heb. 13;4).
> We believe that the only Scriptural marriage is the joining of one
> naturally-born man and one naturally-born woman for life (Gen. 2:24;
> Rom. 7:2; I Cor. 7:10; Eph. 5:22)

https://www.firstbaptistgeneseo.com/we-believe (last visited 10/25/2022).

Tristan's brother, Keir, explains to the court in his letter in support of Tristan, "We went to church for Sunday school, Sunday morning service, Sunday night service, Wednesday night prayer meeting, and Saturday morning "soulwinning"/door-knocking; we wore suits, or at least dress shirts, ties, and slacks, to all of these activities. . . . We practically lived at church." Tristan's brother, Steven gives this description of the family home, "Going [sic] up our household was extremely religious, everything biblical taken literally, any deviation from that was looked on very negatively. Whether it was secular music, books, homosexuality, rock music, pokemon, dungeons and dragons, ect; if ever a house was a product of the 'satanic panic' it was ours." A part of the satanic panic was Tristan and his brothers being homeschooled and not being "allowed to talk to kids that weren't part of the church."

Keir has an enduring memory of "a church elder one time telling the teens about the evil of 'the faggots and the maggots.'" And while not everyone in the church "was as militant on the issue as the person who issued the above quote, many were; and

regardless of the severity of the opinion about homosexuality, it was still unapologetically evil and sinful in our microcosm." Steven confirms, "There were several events growing up were [sic] [Tristan] was told in no uncertain terms gay is evil, being gay means you go to hell."

When Tristan's secret was exposed, his parents' solution was taking Tristan to the church youth pastor. Not surprisingly, the pastor recommended "conversion therapy" in Fort Dodge, Iowa. Of course, this dangerous and demeaning treatment did not "cure" Tristan. He had no disease that needed curing. What the treatment did was further the message that Tristan was an abomination damned to hell.

As if this was not enough, Tristan and his mother, in her words, "clashed." His mother admits, "Tristan was the middle child and often the one getting into mischief. His younger brother was the baby and the older brother was the golden child who succeeded at everything. Tristan often felt that he lacked love and attention." Tristan's brothers agree, "their mother disciplined Tristan more frequently than the others despite minimal differences in their behaviors." His mother called Tristan "stupid," broke a wooden spoon on his body while administering corporal punishment, and constantly made sibling comparisons to degrade Tristan. Steven recalls his mother asking Tristan, "why can't you just be good, why can't you be like Keir?"

That was Tristan's childhood. Never good enough. Damned to hell for being gay. Failing to find support in the real world, Tristan turned to the internet. A serial child exploiter found Tristan. Over time, this exploiter, S.W., exploited Tristan and groomed him to become a child exploiter.

3

S.W., entered into a slave/master relationship with Tristan. He and others exploited Tristan when he was a minor. Acting on a cybertip, English law enforcement found S.W. They seized his electronic media, and questioned him extensively. S.W.'s media contains five images of 17-year-old Tristan being exploited. There are images of Tristan masturbating over the toilet, urinating, masturbating in the shower, and putting his finger in has anus at the command of either S.W. or some other actor working with S.W. Investigators also found evidence of S.W. exploiting at least 7 other minors before he met Tristan. The slave/master motif was a recurring theme throughout the exploitation. S.W. continued to exploit children, sometimes with Tristan's help, sometimes on his own, until his arrest on May 31, 2019.

Filed separately under seal and marked as Defendant's Exhibit A is a Detective Constable's summary of his investigation of S.W.[1] That summary puts Tristan's actions in their proper context. Nothing in the summary makes Tristan not guilty. Tristan submits that his exploitation at the hands of S.W. mitigates his conduct, and supports a shorter sentence than would be appropriate absent S.W.'s exploitation. It is of course up to the Court to decide how to proceed with reviewing Tristan's sentencing submissions. He respectfully suggests that reading the summary before continuing with this Commentary and accompanying mitigation report would be helpful in understanding the arguments made therein.

---

[1] The material in Exhibit A is subject to a protective order. The government has consented to the material being provided to the Court under seal.

A. The nature and circumstances of the offense and the history and characteristics of the defendant.

1. The nature and circumstances of the offense.

Between the PSR and the Detective Constable's summary, the Court has a detailed description of Tristan and S.W.'s conduct. Tristan will not regurgitate the summary but he will highlight some points he feels important.

First, S.W. had a long history of exploiting minors before he found Tristan. Tristan had no history of exploiting minors before meeting S.W. Second, S.W. used a female persona to exploit minors prior to meeting Tristan. Exhibit A, bates 911. He also created a Jessica Samms Facebook account, and Instagram account. *Id*. Tristan had no history of pretending to be a female prior to meeting S.W. Third, S.W. established master/slave relationships with the minors he exploited before meeting Tristan. He then used that power imbalance to further the exploitation. Tristan had no history of entering into a slave/master relationship with anyone prior to meeting S.W. S.W. used the slave/master relationship he developed with Tristan to coerce Tristan's participation in exploiting other minors. That coercion is not a defense to Tristan's actions, but they are a mitigating factor.  Fourth, when Tristan met with Victim 6 in Geneseo (PSR ¶18) and when he attempted to meet Victim 9 in Geneseo (PSR ¶¶ 16-17), he did not use the Jessica Samms or any other female persona.[2] He acted as himself with both victims. Tristan submits these facts show the following: the Jessica Samms persona

---

[2] Victim 6's birthday is August 31, 2001. Accordingly, Victim 6 turned 17 on August 31, 2018. Seventeen is the age of consent in Illinois. So, depending on what the victim meant by meeting Tristan at the "end of summer" 2018, (PSR ¶ 19) he was either 17 or 16 years 11 months old.

and the use of that persona to exploit minors was S.W.'s idea and Tristan acted at S.W.'s direction when using the Jessica Samms persona to exploit minors.

       2. Tristan's history and characteristics.

Tristan's offenses are inextricably intertwined with his history and characteristics. Tristan entered the internet woefully unprepared for what he would find there. The combination of his religion, his sexuality, and his mother's rejection left Tristan naïve and vulnerable. S.W. exploited that vulnerability to tragic results.

The biggest factor in Tristan's life growing up was his church. He and his family practically lived at the church. He was forbidden to interact with people who did not attend the church. He was home schooled so he would not be exposed to people and ideas outside of the church. The church and its teachings were the single, dominate force in Tristan's life. Those teachings told Tristan he was a sinner. An abomination. A faggot. A maggot. Damned to hell.  No person could endure that torture and have a healthy sense of self-worth.

Tristan's church was absolute and unforgiving. When Tristan was told he was a sinner and damned to hell, he was taught that meant he would "spend a conscious eternity in a literal and tormenting hell, and following the Great White Throne Judgement, the lake of fire." https://www.firstbaptistgeneseo.com/we-believe Statement of Faith, Section 11 (last visited 10/25/2022).  For clarification, Revelation 20:10 says that at the end of a thousand years of imprisonment the devil will be thrown into a "lake of fire and sulfur where the beast and the false prophet were, and they will be tormented day and night forever and ever." Following that, the person sitting on the

Great White Thrown (presumably Christ), will open the "book of life" and anyone whose name is not in the book (sinners' names are not included in the book) will also be thrown in to the lake of fire. Revelation 20:11-15.

As crazy as all this sounds, Tristan was taught these words from the King James Bible where "inerrant, infallible, and God-breathed, and therefore the final authority for faith and life." https://www.firstbaptistgeneseo.com/we-believe Statement of Faith, Section 1 (last visited 10/25/2022). As a result, as a young teenager trying to figure out how to live with his homosexuality Tristan had to try to get his head around the idea that being attracted to boys meant after death he would be tormented in hell and then the lake of fire forever and ever. It is difficult to comprehend fully how confusing and disturbing this was to Tristan. It is not difficult to comprehend how these teachings lead Tristan to have a terrible lack of self-worth.

Tristan does not mean to denigrate religion and the good it is capable of performing. Many people gain great comfort and support from their religious beliefs. Many religious institutions perform wonderful acts of charity. Many of the letters of support submitted on Tristan's behalf discuss Tristan's charitable activities through his church. But while capable of great good, religion is also capable of ostracizing and demeaning people who are different. Those two facts can create terrible cognitive dissonance for a gay person who is also a member of a religion that rejects

homosexuality. The attached mitigation report discusses this issue in detail. Exhibit B at 10-16.[3]

Adding to Tristan's lack of self-worth was the treatment he received from his mother. The mitigation report lays out in detail Tristan's struggles with his mother. While not acting maliciously, Tristan's mother caused him significant mental and emotional harm by constantly berating him and making him feel "less than" his brothers. Tristan's relationship with his mother deteriorated to the point where he needed professional help.

On June 21, 2017, Tristan had his first session with counselor Andy Vandercoy at Compassion Counseling, Inc. Exhibit C; PSR ¶ 120.[4] Those sessions continued through October 30, 2018, less than a month before Tristan's arrest. Tristan's parents arranged for counseling after Tristan posted "pray for me" on his Facebook page. Tristan's "Presenting Complaint" was "relationship with mother." He displayed depression, anxiety and had suicidal thoughts. The records state the history of Tristan's present illness was feeling "not good enough."

The handwritten notes are hard to read but a constant theme in his sessions was not feeling good enough due to his mother's treatment, struggling to meet friends, and, later, dealing with his parent's divorce. Of course, during this time Tristan was also being exploited by S.W. and was exploiting others as set forth in the PSR. Tristan could

---

[3]  The mitigation report discusses mental health diagnosis for some family members so is being filed under seal.
[4]  Because this exhibit contains mental health records, it is being filed under seal. The records are in reverse chronological order.

not bring himself to discuss his situation with S.W. in therapy. Mr. Vandercoy has submitted a moving letter in support of Tristan. "Tristan was compassionate, passionate, and desired to do well in this world. He wanted to better himself and learn how to find better ways to cope with stress, depression, and anxiety. He certainly was genuine when he made the conversations not about himself, but how he wanted to grow. He seemed to have positive impacts on me, his co-workers, his friends and family." Tristan shares Mr. Vandercoy's hope that "he can continue to not give up and continue to work on himself to be that positive impact he always wanted to be. I honestly believe Tristan is genuine and has the capacity to change, I never doubted it when I knew him. When he returns at some point to live his life again, I hope he will work with a Clinical Psychologist, attend some group therapy and work within the community for a charitable program."

Finally, the Court should remember that Tristan was just 17 when S.W. first got his hooks into him and only 21 when he was arrested. Not only that, Tristan was not a worldly 17-year-old. He had been homeschooled for almost all of his life, and forbidden to interact with people outside his church. He had far less interaction with the wider, real world than the average 17 year old.

The Supreme Court has repeatedly held that youth should be a mitigating factor at sentencing. *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) (footnote omitted). "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." That was certainly true for Tristan. In *Gall v. United States*, 552 U.S. 38, 57-58 (2007), the Supreme Court found the

district court had properly considered the defendant's young age at the time of the offense, 21, a mitigating factor supporting a sentence well below the applicable guideline range.

Specifically, the district court said this about the defendant's age at the time of the offense and how that fact affected the sentencing process:

> Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five.... [T]he recent [National Institutes of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.

*Gall*, 552 U.S. at 58. The same is true here. Tristan's young age does not excuse his behavior, but the Court should take his age into consideration when imposing sentence.

The Court will note that by March of 2017, S.W. knew Tristan's real identity, and routinely threatened to send images of Tristan engaging in sexual activity to his parents, brothers, and friends. Virtually all of the criminal conduct in this case occurred after March 2017. The only exception is that Tristan used the Jessica Samms persona to obtain sexually explicit pictures of Victim 1 in 2016. But the hands on sexual activity between Tristan and Victim 1 described in paragraph 25 of the PSR did not occur until June 2, 2017.

B. The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Tristan's crimes are serious. That is why as a first time offender he faces a guideline range of life imprisonment, capped at 1,800 months' imprisonment. That is

150 *years*. Tristan deserves a serious sentence, but he does not deserve to die in prison.

As will be discussed more *infra*, *United States v. Peters*, 15-50026 (N.D. Ill.); 21-1003 (7th

Cir. 2021), is a case similar to Tristan's. There, the defendant exploited up to 7 minors

both online, and in person, including engaging in nonconsensual sex acts with two of

the victims. The defendant also fled to Canada while on bond.

      The defendant faced a guideline range of life imprisonment, capped at 90 years'

imprisonment by the applicable statutory maximums. At sentencing, Judge Matthew

Kennelly said this about the guideline's recommendation of a life sentence:

> My general view of things is that life sentences are reserved for murder
> cases, and maybe some other extremely serious cases, way more serious
> than what we are talking about here, and not that this isn't serious. I don't
> think a life sentence is appropriate, and I'm not going to do what is
> sometimes done where I say, you know, the sentence is X, and then it
> doesn't say "life," but it amounts to a life sentence. I am going to impose a
> sentence of 26 years' imprisonment.

*Peters*, 15-50026, Dkt Entry 106 at 55. Tristan agrees with Judge Kennelly's that a life

sentence, or its functional equivalent, should be reserved for murder cases, or cases

involving extreme violence. The worst of the worst. Tristan's crimes are serious, but

they do not warrant life imprisonment, or 1,800 months, which is its functional

equivalent.

      The Court should also consider that last Monday, November 14, 2022, marked

four years since Tristan's arrest. He has spent the entire four years at the Henry County

Jail. That is an incredibly long detention in a county jail. It is even longer when those

years include COVID detention. The Henry County jail gives inmates *no* time outside.

None. Tristan has been outside, in fresh air, two times in four years. He was briefly

outside when taken to a dentist appointment in Cambridge, and again when taken to an eye exam in Geneseo. His time outside was walking from the transport vehicle into and out of the respective doctors' offices. Tristan has been to Court nine times during his four year detention, but on those trips he enters and exits the transport vehicles in a sally port either at the jail or the courthouse. And, for a year and a half, from February 6, 2020, to September 15, 2021, he had no in person court appearances.

The four years of imprisonment Tristan has already served have been hard, hard time. The Court should consider that fact when imposing sentence.

C. The need for the sentence to afford adequate deterrence to criminal conduct.

The concept of general deterrence assumes a potential criminal will hear about the Court's sentence in this case and for fear of receiving a similar sentence, decide not to sexually exploit a minor. The only realistic manner in which such a person would hear about the Court's sentence is through a news story or word of mouth. Either way, the only piece of information that will realistically influence a prospective criminal's decision-making is the term of imprisonment. The Court must impose at least 15 years' imprisonment. If a prospective sentence of 15 years' imprisonment is not sufficient to deter the would be child exploiter hearing of Tristan's sentence a sentence of 20, 50, 100, or 1,800 years' imprisonment is not going to add any deterrent effect. In other words, it is not reasonable to assume there is a prospective child exploiter willing to exploit a child if he thinks he'll only receive 15 years' imprisonment if caught but not willing to commit the crime if he fears he will receive 25 years or 50 years' imprisonment.

People do not think that way. That is why modern research has shown "that deterrence is primarily a function of the *certainty* of punishment, not its *severity*. Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, 87 UMKC L. Rev. 113, 123 (2018) (citing Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 207 (2013)). Tristan's prosecution, conviction, and sentencing may deter someone who hears about them from committing a similar crime. But that deterrent impact will not meaningfully increase based on the length of the Court's sentence.

D. The need for the sentence to protect the public from further crimes of Tristan.

Tristan will be in prison and on supervised release for a minimum of 20 years. He's quite sure it will be longer than that. Most likely, the Court will impose a very lengthy term of supervised release, perhaps life. Either way, Tristan will be under the supervision of the Federal criminal system for a very long time. That fact in and of itself provides sufficient protection to the public from Tristan.

More importantly, since his arrest, Tristan has confronted his sexuality. He has come to accept himself as a gay man. He has come out to his family. Tristan will talk about this process during his allocution. The mitigation report also talks about this process. While not every family member has fully come to grips with Tristan's sexuality, his family has expressed its love and support, as have some friends. These facts, more than anything else, will protect the public from any future crimes committed by Tristan. Tristan no longer needs to hide his true self from the world and look to the internet for acceptance and sexual gratification.

E. The need to avoid unwarranted sentencing disparities.

Trying to avoid sentence disparities is hard. No two defendants are exactly alike, and no two crimes are either. Tristan posits two cases as comparators for the Court's consideration. The first case is *United States v. Maxwell*, 20-330 (S.D.N.Y.). The second case is *United States v. Peters*, 15-50026 (N.D. Ill.).

1. *United States v. Maxwell*

Ghislaine Maxwell conspired with Jeffrey Epstein to traffic minors for sex. A jury convicted Maxwell of conspiring with Epstein to entice minors to travel to engage in illegal sex acts and to transport minors to participate in illegal sex acts. She was also convicted of aiding and abetting the entice of minors to engage in illegal sex acts, and sex trafficking of minors. *United States v. Maxwell*, 20-330 (S.D.N.Y.), Dkt Entry 670 at 4. At sentencing, the district judge described Maxwell's conduct as follows:

> Ms. Maxwell worked with Epstein to select young victims who were vulnerable. Once selected, Ms. Maxwell played a pivotal role in facilitating the abuse of the underaged girls through a series of deceptive tactics. A sophisticated adult woman, she provided an initial venire of responsibility and even safety. She befriended and developed relationships of trust. She then manipulated the victims and normalized sexual abuse through her involvement, encouragement, and instruction.
>
> * * * * * *
>
> [T]he criminal conduct established at trial was extensive and it was far-reaching. Ms. Maxwell and Epstein victimized multiple underaged girls using this pattern, this playbook, over the span of many years and in a variety of locations. And the damage done to these young girls was incalculable.

T. 90. The government's more detailed description of the sex trafficking and abuse of six of the victims is set forth in docket entry 670 at pages 5 through 14.

14

Under the 2003 Guidelines that applied to Maxwell's case, her final offense level was 36 and her criminal history category was I, resulting in a guideline range of 188 to 235 months' imprisonment.[5] Dkt Entry 737 at 49-50. The district judge sentenced Maxwell to 20 years' imprisonment. *Id*. at 96.

The district court found a 20-year sentence reflected "the gravity of Ms. Maxwell's conduct," "the pivotal role she played in facilitating the offense, and the significant and lasting harm it inflicted." *Id*. at 92. The court further found the 20 year sentence promoted general deterrence as it sent "an unmistakable message that those who engage in and facilitate the sexual abuse and trafficking of underaged victims will be held accountable by the law." *Id*. The district court also addressed the fact that Maxwell was wealthy, and her case was high profile. The court found "that Ms. Maxwell is wealthy or that this case is high profile is not a basis for increasing punishment in any regard, but the rule of law demands, and this Court must ensure that, whether you are rich or poor, powerful or entirely unknown, nobody is above the law. "That message serves the important interest in deterrence and just punishment as well." *Id*. at 92-93.

Maxwell's offense conduct is at least as bad as Tristan's, if not worse. Both are bad. Tristan is not denigrating the seriousness of his offense. The reality is that trying to avoid unwarranted sentencing disparities requires comparisons of offenses and offenders. Maxwell went to trial, and never expressed any acceptance of responsibility.

---

[5]  Under today's Guidelines, her guideline range would have been much higher. Dkt Entry 670 at 16.

Tristan pleaded guilty and accepted responsibility. He should not receive a longer

sentence than Maxwell.

      2. *United States v. Peters*

The Seventh Circuit summarized Peters' offense as follows:

> Peters persuaded at least three minors, ranging in age from 14 to 17, to
> engage in sexually explicit conduct for the purpose of recording them.
> Peters, who was around 20 years old at the time, met most of his victims
> over the internet. On some occasions, Peters communicated with the
> victims over online video chat and convinced them to engage in sexually
> explicit conduct (such as masturbation and exhibition of their genitals) so
> that he could record it. At other times, he was physically present with the
> victims while they engaged in conduct (including at least two instances of
> nonconsensual sexual relations) that he recorded on camera. During this
> period, Peters sexually victimized at least seven minors knowing they
> were underage at the time.

*United States v. Peters*, No. 21-1003 (7th Cir.) Dkt Entry 37 at 2. The parties stipulated

that Peters had also engaged in similar conduct with three other minors. *Id.* at Dkt Entry

15 at 3-4; Dkt Entry 20 at 2-4.

      The probation office calculated a guideline offense level of 50 with a criminal

history category of I. This included an obstruction of justice enhancement for

absconding to Canada and seeking refuge status, and the denial of acceptance of

responsibility based on the fleeing. Dkt Entry 20 at 3. At sentencing the district court

awarded acceptance, lowering the offense level to 47, which was then lowered to 43.

Dkt Entry 106 at 54.

      Peters submitted mitigation evidence to show the following: 1) he suffered from

Autism Spectrum Disorder (which went undiagnosed prior to his arrest) which

interfered with his ability to fully comprehend his actions, 2) he had been sexualized at

a young age by his father in an attempt to ensure he was not gay, 3) he was physically abused by his stepfather, 4) he was bullied at school, and 5) his parents let him spend many hours unsupervised on the internet. *Id*. at 18-27. The district judge accepted that evidence and considered it when imposing sentence. *Id*. at 52.

As discussed earlier, the district court rejected a life sentence or a term of years that was so long it was functionally equivalent to life. *Id*. at 55. The district court found the offenses "extraordinarily serious." The court found the closeness of age between Peters and his victims mitigating, stating, "this isn't a case of a 50-year-old having sexual contact with an 8-year-old or an 11-year-old." *Id*. at 50-51. The district court also considered Peters' flight to Canada to "escape responsibility" for his crimes. *Id*. at 55. After considering all of these factors, and having previously determined that it would impose a lifetime term of supervised release, the district court imposed a sentence of 26 years' imprisonment. *Id*. at 55.

Tristan's conduct is similar to Peters', although not identical. Both young men had very troubled childhoods, each victimized by adults. But a stark difference between Peters and Tristan is Peters' attempt to avoid any punishment by fleeing to Canada and seeking refugee status. Tristan has consistently accepted responsibility for his actions and done what he can to assist law enforcement. Given this major difference, Tristan should receive a lower sentence than Peters.

This Court is not bound by the sentences imposed in Maxwell and Peters. But avoiding unwarranted sentencing disparities must mean the Court considers sentences imposed by other judges in similar cases. If the Court only looks to its prior sentences it

17

is not avoiding unwarranted sentencing disparity as that term is used in 18 U.S.C. §

3553(a)(6), it is merely seeking internal consistency. The § 3553(a) sentencing factors try

to balance the sometimes competing goals of individualized sentencing and national

sentencing consistency. That is a hard balancing act. Tristan submits that a sentence of

imprisonment above the mandatory minimum but below 20 years, followed by a

lengthy term of supervised release, will avoid unwarranted sentencing disparity.

Respectfully submitted,


Tristan Scott Blank, Defendant,

By:  /s/ Thomas W. Patton
Thomas W. Patton
Federal Public Defender
401 Main St., Suite 1500
Peoria, Illinois 61602
Telephone: (309) 671-7891
Fax: (309) 671-7898
E-mail: thomas_patton@fd.org

### *CERTIFICATE OF SERVICE*

I hereby certify that on November 17, 2022, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system.


 /s/ Thomas W. Patton
THOMAS W. PATTON
Federal Public Defender