1                 UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF ILLINOIS

3


4
    UNITED STATES OF AMERICA,     )
5                                 )
                 Plaintiff,       )
6                                 )
          vs.                     )    Criminal No. 4:19-CR-40034
7                                 )
    TRISTAN SCOTT BLANK,          )
8                                 )
                 Defendant.       )
9

10                   TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE SARA DARROW
11                    SENTENCING HEARING
                 NOVEMBER 22, 2022; 10:26 A.M.
12                     DAVENPORT, IOWA

13
    APPEARANCES:
14

15  For the Government:      SARAH ELIZABETH SEBERGER, ESQUIRE
                             Asst. United States Attorney
16                           318 South Sixth Street
                             Springfield, Illinois 62701
17                           (217) 492-4450

18
    For the Defendant:       THOMAS W. PATTON, ESQUIRE
19                           Federal Public Defender
                             401 Main Street, Suite 1500
20                           Peoria, Illinois 61602
                             (309) 671-7891
21

22

23           Jennifer E. Johnson, CSR, RMR, CRR
                U.S. District Court Reporter
24              Central District of Illinois

25  Proceedings recorded by mechanical stenography;
    transcript produced by computer

1          (Proceedings held in open court.)

2          THE COURT:  This is the case of the United

3    States of America vs. Tristan Scott Blank, Case

4    Number 19-40034.

5          All parties appearing in open court.  On

6    behalf of the government is AUSA Seberger.  The

7    defendant is present along with his attorney,

8    Mr. Patton.

9          And this matter comes before me this morning

10   for sentencing hearing.

11         Miss Seberger, on behalf of the government,

12   are you ready to proceed?

13         MS. SEBERGER:  Yes, Your Honor.

14         THE COURT:  Okay.  Thank you.

15         Mr. Patton, on behalf of Mr. Blank, are you

16   ready to proceed?

17         MR. PATTON:  Yes, Your Honor.

18         THE COURT:  Thank you.

19         Miss Seberger, has the government satisfied

20   its obligations to notify victims in this case?

21         MS. SEBERGER:  We have, Your Honor, and if I

22   could just expand on that a little bit?

23         THE COURT:  Yes.

24         MS. SEBERGER:  Your Honor, there were a number

25   of victims in this case, approximately 23.  Of

1  those, 13 affirmatively selected to not be

2  contacted by our office.  However, our office,

3  throughout the pendency of this case, at the

4  beginning, contacted all of those victims and, as

5  we approached the sentencing, went ahead and

6  reached out again, whether by phone or email just

7  to at least provide some notice that it had

8  progressed.

9      We do have one family here today on behalf of

10  Victim Number 3 who would seek to make statements,

11  just so the Court's aware.  Otherwise, the other

12  families who were in contact with our office

13  indicated they'd like to know the outcome but did

14  not wish to be present or be heard at this hearing.

15      THE COURT:  Is there any restitution being

16  sought?

17      MS. SEBERGER:  It is -- Your Honor, I

18  recognize I put that in the commentary.  My update

19  for the Court -- and I let Mr. Patton know -- there

20  is no restitution being sought at this time.  Or

21  there is no restitution being sought.  I apologize;

22  I misspoke.

23      THE COURT:  Okay.  All right.  As an initial

24  matter, the two pending motions to seal are

25  granted.

1    Have you had sufficient opportunity to review

2  the revised PSR, and does the addendum accurately

3  state that the government has no objections to its

4  contents?

5    MS. SEBERGER:  It does, Your Honor.

6    There is one scrivener's error that Mr. Patton

7  and I would like to direct the Court to.  I believe

8  it's --

9    THE COURT:  Is that paragraph 39, the Victim

10  19's age was 16, not 14?

11    MS. SEBERGER:  I believe it's Victim Number 9,

12  yes, Your Honor, but otherwise yes.  If I wrote 19,

13  that would be --

14    THE COURT:  It's wrong.  Okay.

15    I'm sorry, there were three pending motions to

16  seal.  All three are granted.

17    But it is paragraph 39?

18    MS. SEBERGER:  Yes, Your Honor.

19    THE COURT:  Victim 9.  That --

20    MS. SEBERGER:  Excuse me.  In the chart, it

21  outlines the ages of victims.

22    THE COURT:  Yes.  That should reflect 16?

23    MS. SEBERGER:  Correct.

24    THE COURT:  Probation is directed to make that

25  revision.

1      Other than that, does the addendum accurately

2  state that the government has no objections?

3      MS. SEBERGER:  Yes, Your Honor.

4      THE COURT:  All right.  Thank you.

5      Mr. Patton, have you had sufficient time to

6  review the revised PSR and discuss it fully with

7  your client?

8      MR. PATTON:  Yes, Your Honor.

9      THE COURT:  And does the addendum accurately

10  state that there are no remaining unresolved

11  objections to its contents?

12      MR. PATTON:  Yes, Your Honor.

13      THE COURT:  Okay.  Thank you.

14      Mr. Blank, have you had sufficient time to

15  review your revised PSR and discuss it fully with

16  Mr. Patton?

17      THE DEFENDANT:  Yes, Your Honor.

18      THE COURT:  And does the addendum -- or is

19  that correct, that he -- there are no unresolved or

20  any remaining objections that you wish for him to

21  raise on your behalf?

22      THE DEFENDANT:  Yes, Your Honor.

23      THE COURT:  Okay.  This is a total offense

24  level of 43 with a Criminal History Category of I.

25  The statutory range on each of counts -- each

1  count, I through V, is a mandatory minimum 15 years

2  to 30 years in prison.  The advisory guideline

3  range is 1,800 months which is 150 years.

4  Supervised release pursuant to statute on each

5  count is a mandatory minimum five years to life;

6  the advisory guideline range is also five years to

7  life on each count.  He is not eligible for

8  probation under either the statute or the

9  guidelines.

10      Is the government seeking a fine in this case?

11      MS. SEBERGER:  We're not, Your Honor.

12      THE COURT:  But the advisory guideline range

13  fine is 50,000 to $250,000, but due to the

14  defendant's indigent status, I will not be imposing

15  a fine in this case.

16      There is no restitution being sought.  And

17  because of the defendant's indigent status, the

18  $500 total special assessment will apply; that's

19  $100 on each count.

20      Do both sides concur with the Court's

21  recitation as to the applicable provisions?

22      MS. SEBERGER:  Your Honor, I apologize because

23  this is my first sentencing in front of Your Honor.

24  I believe also under 18 USC 3014 there may be the

25  mandatory $5,000 assessment.  I don't know if Your

1 | Honor addresses that later?

2 | THE COURT:  No, it's not listed in the PSR so
3 | I didn't comment on it.  I don't know that it was
4 | in effect at the time the defendant committed the
5 | offense, but, Mr. Patton, do you have a position on
6 | that?

7 | MR. PATTON:  Your Honor, it wasn't in the PSR.
8 | We -- so, I don't.  My position is it's not there,
9 | there's no notice, and I don't think it applies.

10 | THE COURT:  Does the government, based on the
11 | timing and the -- is that the newer one, the newer
12 | statutory assessment?

13 | MS. SEBERGER:  I believe it is the newer one,
14 | Your Honor.

15 | THE COURT:  Does it apply to this case, given
16 | the offense conduct dates, and did you object to
17 | the PSR?

18 | MS. SEBERGER:  I recognize that there wasn't
19 | -- it wasn't addressed in the PSR at this time so I
20 | am prepared to move on, Your Honor.

21 | THE COURT:  Okay.  All right.  Thank you.

22 | Do you concur with the Court's recitation as
23 | to the applicable provisions?

24 | MS. SEBERGER:  Yes, Your Honor.

25 | THE COURT:  Thank you.

1    Mr. Patton?

2    MR. PATTON:  Yes, Your Honor.

3    THE COURT:  All right.  Thank you.

4    The Court will adopt the revised PSR and its

5    addendum, and they'll be made part of the record.

6    Does the government have any evidence in

7    aggravation that it wishes to present?

8    MS. SEBERGER:  Your Honor, I'd seek to move in

9    Government's Exhibit A, which was attached to my

10   commentary.

11   And then, Your Honor, I do have -- the parents

12   of Minor Victim 3 would seek to both make impact

13   statements to the Court this morning.  They would

14   ask to go ahead and speak.

15   And then further, they would ask, as support

16   for each other, Your Honor -- I'm assuming you have

17   them speak from the witness chair -- if they could

18   come up together just to have the physical support?

19   THE COURT:  I'll have them -- we'll put

20   another chair over here.  I'll ask Probation to

21   move, and they can testify or they can make their

22   statement from that location.

23   MS. SEBERGER:  And then, Your Honor, I've been

24   identifying them for their privacy at their request

25   as the mother and father of Minor Victim 3 if

1   that's acceptable to the Court?

2        THE COURT:  It is.

3        MS. SEBERGER:  Thank you.

4        THE COURT:  Does the government intend to make

5   a motion as well?

6        MS. SEBERGER:  Oh, we are, Your Honor.  We do

7   have a motion under 5K1.1.  My understanding -- and

8   I would request, Your Honor, if we could discuss

9   that in chambers to provide the Court some more

10  information with counsel and my case agent?

11       THE COURT:  If you wish to make a motion in

12  camera, you may.

13       MS. SEBERGER:  Okay.  Then I would ask to do

14  so.

15       THE COURT:  All right.  But you -- Exhibit A,

16  remind me, was that a victim impact letter?

17       MS. SEBERGER:  Exhibit A is an approximately

18  three-page report from the United States Secret

19  Service, Your Honor.

20       THE COURT:  That's right.  Okay.  That will --

21  I mean, it's already filed, but that will be

22  considered as evidence in the case.

23       (Whereupon, Government Exhibit A was

24  admitted.)

25       THE COURT:  The -- I normally would proceed to

1  the victim impact statement after I've entertained

2  all the commentary as to sentencing factors and

3  considered the motion in camera, but if you wish to

4  consult with the victim's parents at this time and

5  ask if they'd like to do it now or if they'd like

6  to wait.  So, it would be before -- it would be

7  after the arguments are made but before I pronounce

8  sentence.

9      MS. SEBERGER:  If I could have just one moment

10  to check?

11      THE COURT:  You may.

12      MS. SEBERGER:  Thank you, Your Honor.

13      (A pause was had in the record.)

14      MS. SEBERGER:  Your Honor, we would defer to

15  the Court's normal practice and address it later.

16      THE COURT:  Okay.  So, at this time, we will

17  move in camera to entertain the government's

18  motion.

19      We'll be in recess for the in camera hearing.

20      (In camera hearing held and not transcribed

21  without court order.)

22                    *  *  *  *  *

23      (Proceedings held in open court.)

24      THE COURT:  We're back in open court, and the

25  government's motion pursuant to 5K1.1 is hereby

1  granted.

2      Did I already ask the government if they had

3  any additional evidence in aggravation other than

4  the one exhibit?

5      MS. SEBERGER:  You did, Your Honor, and we do

6  not.  And again, the victim impact statements will

7  be given in Your Honor's normal procedure later.

8      THE COURT:  Right.  That will be after

9  counsel's argument.

10      Does the defendant have any additional

11  evidence in mitigation other than the attachments

12  to the sentencing memorandum?

13      MR. PATTON:  No, Your Honor.

14      THE COURT:  All right.  Thank you.

15      I'll entertain the government's commentary as

16  to the 3553(a) factors in support of whatever your

17  recommended sentence is.

18      MS. SEBERGER:  Thank you, Your Honor.  May it

19  please the Court, Counsel, Mr. Blank.

20      Your Honor, in this case, there's really not

21  much for an attorney to say that can be any more

22  powerful or persuasive than some of what the

23  Court's seen both in the victim impact statements

24  but also in the summary of the offense, both in the

25  plea agreement, in the PSR, and other supporting

1   documents submitted by both parties in this case.

2       This defendant victimized over 20 children,

3   both by blackmailing them into providing sexual

4   images but also by sexually assaulting multiple

5   children.  Your Honor will hear, I believe, from

6   the defense as mitigation that this defendant did

7   so in part because he was coerced into doing so by

8   a co-conspirator.

9       Your Honor, what's clear from the record in

10  this case was while there may have been a joint

11  scheme in which a co-conspirator played a stronger

12  or leadership role, this defendant still

13  perpetrated crimes against victims, including at

14  least two victims he identified as being outside

15  the scheme with that co-conspirator.

16      I would also note in particular as it relates

17  to Minor Victim 3 in this case, the idea that this

18  defendant engaged in this behavior based on threats

19  of another person to reveal photos and other

20  information, as this defendant perpetrated that

21  same scheme on Minor Victim 3, and Minor Victim 3

22  sought to stop the behavior due to Minor Victim 3's

23  suicidal ideations, there were no further -- there

24  was no photos posted on the internet of that

25  victim.  So, this defendant clearly had the message

1  that this could stop, and he could move forward,
2  and he could break this off.

3      It was clear that life and death was too far
4  in terms of this alternative, I will call it --
5  alternative sexual, master/slave type relationship
6  he had with the co-conspirator in the United
7  Kingdom.  However, this defendant did not stop,
8  and, Your Honor, he did not stop because this was
9  activity, quite frankly, that he enjoyed
10 participating in.

11     This is part of -- another huge part of why
12 we're here, Your Honor, in terms of nature of the
13 offense that can't be ignored, is that the
14 defendant engaged in this sexual activity with
15 children because it was something he enjoyed.

16     And I want to make sure I draw the distinction
17 that, you know, we're not here because -- because
18 of anyone's sexual orientation or anyone's
19 enjoyment of perhaps more obscure, alternative
20 sexual activities using the internet.  We're here
21 because there was a crime perpetrated against
22 children.  Those things are okay potentially
23 between consenting adults, Your Honor, but not when
24 it involves children and, in particular, children
25 that in some ways this defendant had some what I

1  would say is arguably a position of authority over
2  those as it relates to the basketball team.

3       Your Honor, when you look at the 3553 factors,
4  again, the nature and circumstances really speak
5  for themselves.

6       And in looking at the history and
7  characteristics of the defendant, the government
8  recognizes what was certainly not an easy
9  childhood; however, again, as I've previously
10 mentioned, those circumstances do not account for
11 the continued victimization of these children in
12 this case in particular, both based on what the
13 evidence shows about this crime and also again
14 based on, again, the sheer number of victims.

15      Your Honor, turning to the third factor, a
16 sentence that reflects the seriousness of the
17 offense and protects the public, that third factor,
18 Your Honor, the government is recommending a
19 sentence of 27 years imprisonment in this case
20 followed by 15 years of supervised release.  We
21 believe that is appropriate in light of --

22      THE COURT:  I need you to separate out your
23 recommendation based solely on the 3553(a) factors
24 before application of the 5K1 motion, please, so
25 the record is clear.

1       MS. SEBERGER:  Absolutely.  Thank you, Your

2  Honor.

3       Your Honor, the government, solely based on

4  the 3553 --

5       THE COURT:  (a).

6       MS. SEBERGER:  -- (a) factors is recommending

7  a 30-year sentence in this case.  Your Honor, that

8  does -- as the Court mentioned, obviously, there

9  was a 5K motion; there was assistance provided to

10 the government.  And sort of also connected with

11 that, Your Honor, is, obviously, then the sum total

12 recommendation of the government of 27 years.

13      I want to just touch briefly as it relates to

14 the defendant has offered letters in support from

15 various family members and friends, and I think one

16 thread that runs through them is that there was not

17 perhaps a clear understanding of the severity of

18 the offense.

19      And I mention this as it relates to that third

20 factor, as it relates to deterrence and other

21 issues in this case.  Your Honor, this is not a

22 person who -- I mean, the word "mistake" is used.

23 This is not a mistake kind of case.  This is over

24 20 children victimized by this defendant.  And

25 again, Your Honor, yes, some of it was in

1   conjunction with a co-conspirator in another
2   country, but additional parts of it were actions
3   here.  In particular, obviously, the actual
4   hands-on assault, sexual assaults, and also victims
5   outside of that conspiracy.
6       And we think those factors in particular,
7   again, part of those nature and circumstances of
8   the offense, weigh heavily in favor of the sentence
9   the government requests, which is again ultimately,
10  based on that 5K motion, the 27 years and 15 years
11  of supervised release.
12      THE COURT:  All right.  Thank you.
13      At this time I would invite the victim impact
14  statement, and then we will proceed to the
15  defendant's argument, and then I will proceed to
16  sentencing.
17      So, take your time, and if you're -- I think
18  maybe it's more comfortable here, this stand, if
19  you sit and proceed to your statement.  You can
20  either stand or be seated, whatever's most
21  comfortable.
22      FATHER OF MINOR VICTIM 3:  Thank you.
23      MOTHER OF MINOR VICTIM 3:  Thank you.  Should
24  I move this?
25      Okay.  Thank you for letting us speak on

1  behalf of our family.  Our son is one of the

2  children of whom this human took advantage.  We are

3  here today to speak on behalf of our son and the

4  effects that this man's actions has had on our

5  family.

6      The situation that took place with this man

7  and my son stole so much from my family.  He stole

8  our son's innocence.  He stole our son's trust in

9  other people.  He stole and ruined our son's

10  grandfather's last moments on this earth.  This

11  whole situation came to light in his grandpa's last

12  days.  We literally left the forensic interview and

13  hadn't even made it home when we got the phone call

14  that we had to get there right away, and he was so

15  stressed from doing that that he didn't get to go

16  sit with his grandpa, and that stole his last --

17  his grandpa's last moments with my son.

18      After this man took advantage of our child and

19  prior to us being aware, my son started burning

20  himself.  At that time, we had no idea what could

21  have happened to this kid.  This kid loves life.

22  He's funny.  He tells stupid jokes.  He has the

23  puns.  And all of a sudden, it was -- he was

24  different.  We didn't know why.  And then we got a

25  call from the detective, and suddenly we

1  understood, and it made sense.

2      Prior to our son's interaction with this man,
3  our son was quiet in large groups, but in small
4  groups he would show his quirky, fun-loving sense
5  of humor.  Since this incident and still to this
6  day, he does not like large groups, even when it's
7  just family.  Our son keeps a circle very small and
8  trusts very few people to let them know the way
9  that we do -- know him the way we do.  We praise
10  God we raised our son smart enough to not go meet
11  up with this man in person.  If that had happened,
12  it would have been so much worse.  And we
13  understand that other children weren't so lucky; we
14  pray for those families and those kids.

15      Our son went through at least a year of
16  therapy.  We're so thankful that his therapist was
17  so attentive to him and helped him overcome so
18  much.

19      As his parents, we worked with each other, our
20  church, and a select few family members who could
21  get us -- help us get past this.  In spite of this,
22  my husband has needed professional help, and this
23  has moved him into a deep depression that he's only
24  just beginning to move through.  There have been so
25  many sleepless nights, many angry moments where we

1   just want to let that anger out on the human that

2   caused and that deserves our anger, and we can't do

3   that, more tears than we can count, more prayers

4   than we ever thought that we would need.

5        Every time we think court is coming, we can

6   watch the depression in the whole household just

7   come down.  And even as I was writing this, the

8   depression and anger just kept getting worse.

9        To this day, our son rarely speaks of what

10  happened to him and prefers that we just don't talk

11  about it, which is why we're here speaking for him.

12  I don't disagree.  He needs to move on.  He needs

13  to have a healthy life in spite of what that human

14  did to him.

15       Since this happened, our son no longer

16  believes in God.  While he doesn't talk about it,

17  he only started questioning God since his

18  interactions with this man.  Our family refuses to

19  use his name in our household.  We have no room for

20  him in our life, and I refuse to allow even to have

21  his name spoken in our household.

22       I strive every day to forgive for what he's

23  done to our boy.  Some days I'm there, and other

24  days I just want to tattoo "Child Molester" across

25  his head and put him in general population.

1      Thank you to the police, the attorneys, the

2   therapists, advocates, and every other human who

3   has worked so hard.  Thank you.

4      While the court system can never bring back

5   our children's innocence, we hope the punishment is

6   severe, and he's honestly never allowed to walk

7   free or never, ever, ever come in contact with a

8   child again in his lifetime.

9      Thank you.

10      THE COURT:  Thank you.

11      FATHER OF MINOR VICTIM 3:  I fought to give a

12   statement today because the words that want to come

13   out of my mouth I don't want to use in this

14   courtroom and disrespect anybody, but I want to say

15   as a father, as a Christian, a man who has gone to

16   church my whole life, I do not forgive this man,

17   and I hope he spends many years beyond what's being

18   asked in prison for what he has done.

19      MOTHER OF MINOR VICTIM 3:  Thank you.

20      THE COURT:  Thank you.

21      We're going to take a ten-minute recess, and

22   then we'll proceed.

23      COURTROOM DEPUTY:  Court is in recess.

24      (Recess at 11:15 to 11:37 a.m.)

25      (Proceedings held in open court.)

1        THE COURT:  Mr. Patton, I'll entertain your

2   commentary as to sentencing factors in support of

3   your recommendation.

4        MR. PATTON:  Thank you, Your Honor.  May it

5   please the government.

6        Look, we don't dispute the government's

7   statement that a child being exploited in this way

8   is damaged and is hurt.  There's no dispute in this

9   case that Tristan, as a minor, was exploited by

10  this gentleman from England the way that then the

11  victims in this case were victimized.

12       THE COURT:  He was 17, right?

13       MR. PATTON:  He was 17 --

14       THE COURT:  Okay.

15       MR. PATTON:  -- which is -- under federal law,

16  it would be exploitation to take the images of a

17  minor under the age of 18.  Some of the victims in

18  this case were younger.  Some of them were 16; some

19  of them were very close to 17.  But to be clear,

20  this gentleman in England had -- on his devices, he

21  had a whole lot of images of Tristan, but as a

22  minor, he had images of Tristan masturbating over a

23  toilet and ejaculating into the toilet.  He had

24  another image of --- a video of Tristan

25  masturbating over a toilet.  He had a video of

1   Tristan peeing into a toilet.  And we know from the

2   investigation in England how this particular

3   predator in England would have minors that had done

4   this for years prior to him encountering Tristan,

5   having minors urinate and defecate on his command.

6        There are two videos -- up-close videos of

7   Tristan, at the direction of somebody on the other

8   end of the video, putting his finger into his anus.

9   On one of those videos, a person saying -- and a

10  person that was not S.W. and was not Tristan

11  because I know both of those voices because I've

12  watched a lot of videos, so somebody else

13  participating in watching Tristan be exploited,

14  saying, "My favorite body part because you get an

15  orgasm every time something goes up there."

16       So, this was done to Tristan as a minor as

17  well.

18       And we know that S.W. had a long history of

19  abusing minors before he met Tristan, and we know

20  that there is no evidence that Tristan exploited

21  any minors before he met S.W. online.  Those are

22  undisputed.

23       It is our position -- and I think that we have

24  established this through our written submissions --

25  that Tristan was uniquely vulnerable to an online

1    predator, given his history and characteristics.

2        The Court, of course, has to consider the

3    nature and seriousness of the offense, but that

4    same 3553(a) factor says the Court also has to

5    consider Tristan's history and characteristics.

6    And his history is growing up immersed in a church

7    that told him he was no good.  And I'm not trying

8    to in any way say that the government is

9    prosecuting Tristan because of his sexual

10   orientation.  They are not.  But the facts remain

11   that Tristan grew up gay in a house where, as his

12   one brother put it, *We lived at church*, and that

13   church, right on their website in their statement

14   of values, is virulently antihomosexual.  And

15   Tristan's brothers' letters explain how Tristan,

16   through the church, was repeatedly told in no

17   uncertain terms that homosexuality was evil and

18   that anyone who was homosexuality -- who was

19   homosexual was damned to hell.  And his brother

20   Keir writes of a church elder telling the youth

21   group there about the, quote, maggots and fagots.

22   That is the environment in which Tristan grew up.

23       In addition to that, in his home life, he was

24   -- not maliciously by his parents, but he just was

25   not -- meant to feel he had worth.  He was never

1    good enough.  He couldn't stack up to his brothers.
2    And to the point where he became suicidal and was
3    in therapy for depression and anxiety because his
4    parents, based on posts he made on social media,
5    were afraid that he was suicidal.  And the mental
6    health records that we submitted show that at the
7    first meeting/therapy session he had with his
8    therapist, his therapist documented that Tristan
9    was suicidal.  And that was in late 2016.

10       And so Tristan went to the internet trying to
11   figure out his sexuality, to try and find some
12   acceptance, and, unfortunately, he found this
13   gentleman S.W. -- or S.W. found him, along with
14   others, who did prey on him.

15       It is not a defense to the charges, and we
16   have never claimed that it is a defense to the
17   charges.  Tristan has pled guilty, has accepted
18   responsibility for what he did, and he is going to
19   face a very lengthy period of incarceration and
20   supervised release because of what he did.

21       But as the statutes direct you, the law
22   directs you to take into account his personal
23   history and characteristics because you have to try
24   and sentence him as an individual and not look just
25   at what he did but also who he is and how he came

1  to commit these offenses.

2      He was young, and the Supreme Court has said

3  repeatedly that young age is a mitigating factor,

4  and the Supreme Court has said this in cases where

5  the people are adults -- they're being charged as

6  adults, and that the law recognizes that even

7  though we say at the age of 18 someone reaches

8  majority and becomes an adult, their brains aren't

9  fully developed; they do not think and reason the

10  same way as an adult.  I mean, for all but the last

11  couple months of this, our society said that

12  Tristan wasn't old enough to responsibly use

13  alcohol, recognizing that at that young age people

14  don't make good decisions.  And so the fact that

15  Tristan was a minor when this began, but then it

16  continued until he passed 18, and it went on until

17  he was a few months past his 21st birthday, that

18  his age is a mitigating factor.

19      Tristan has sat, as we've explained in our

20  papers, at the Henry County Jail for four years.

21  Last week it was four years.  And the length of

22  that time was inextricably linked to the 5K motion

23  and the things we discussed in chambers.  County

24  jails are not set up for people to stay for

25  extended periods of time.  There is no education.

1   There is no therapy.  You can't even go outside.
2   Tristan's been there so long, we tried to get him a
3   new pair of glasses.  His pair of glasses, the
4   screws for both of the arms of his glasses are
5   gone.  He has them held together by peeling off
6   labels from the shampoo bottles they buy at
7   commissary and taping up his glasses.  We've tried
8   to work with the jail and with the marshal service
9   to get him a new pair of glasses.  They're also
10  very scratched because he's been in jail for four
11  years with the same pair of glasses.  But the
12  marshal service would not agree to provide them.
13      In that four years was COVID, where --
14  completely locked down.  For a year and a half, he
15  didn't go outside that place ever.  He had no court
16  appearances.  The only time he had been outside was
17  going to a doctor's -- a dentist appointment and an
18  eye doctor's appointment.  So, that is hard time,
19  and the length of that hard time was extended based
20  on him trying to do what he could to assist.
21      Your Honor does have to consider deterrence,
22  both general and specific.  The idea of general
23  deterrence is that there is somebody out there that
24  if they hear about this case, and if they hear
25  about the sentence Your Honor imposes, it will

1  persuade them not to commit a crime.  That's the
2  only way general deterrence works, right, is a
3  potential criminal hears about a sentence that is
4  imposed and, gaining that knowledge, then convinces
5  them not to engage in the crime.

6      The mandatory minimum's 15 years.  Even if he
7  got the mandatory minimum, which I doubt Your Honor
8  is going to impose, if some potential criminal
9  reads about -- would read about somebody who
10  committed the same crime that potential criminal
11  was thinking about committing, and that potential
12  criminal says, *Wow, that guy got 15 years,* if that
13  -- the prospect of 15 years in prison doesn't deter
14  that person from committing the crime, no term of
15  imprisonment is going to deter that person from
16  committing a crime; they're not deterrable.

17      The fact of getting caught, getting convicted,
18  and getting a sentence, yeah, that can deter
19  people.  And while -- the studies have generally
20  shown that the length of sentence just doesn't
21  impact the deterrent effect, which really the
22  deterrent impact comes from, *Do you think you're*
23  *going to get caught?*  And seeing that people get
24  caught, seeing that people get prosecuted, and
25  seeing that they get prison sentences, that's where

1    the deterrence comes from.  So, I would submit you
2    don't have to impose a 30-year sentence for general
3    deterrence.  It's not going to have any more actual
4    general deterrent effect than a 15-year sentence.
5    There just is nobody out there saying, *Yes, for 15*
6    *years, I'll do that crime, but for 30, no, that's*
7    *too much.*

8         That just -- I would submit to you that that
9    human being does not exist.

10        As for specific deterrence to Tristan, I would
11   submit that the factors that help drive Tristan to
12   this point and to committing the crimes have been
13   addressed because he's had to come to grips with
14   his sexuality.  He's had to -- his family knows
15   about his sexuality.  He has had to come out to
16   them about it and tell them, *This is who I am*.  And
17   he has come to accept himself, that this is who he
18   is.

19        He knows what he did was wrong.  It's why he
20   pled guilty.  And he will have a very long period
21   of incarceration to continue to get the message
22   that he shouldn't commit any more crimes.  He's
23   going to be on supervised release.  I would hazard
24   to guess that between whatever term of imprisonment
25   Your Honor imposes and whatever term of supervised

1  release Your Honor imposes that he will be under
2  the supervision of the federal criminal system, if
3  not for the rest of his life, for pretty darn close
4  to it, and so that will help with the specific
5  deterrence.
6       And then you have to deal with unwarranted
7  sentencing disparities.  And I put forth in some
8  detail two comparators in our commentary that I
9  would submit would support a sentence well below
10  what the government has recommended.
11      Miss Maxwell was one of the top 1 percent of
12  1 percent wealthiest people in the world and
13  engaged in a years-long conspiracy with Jeffrey
14  Epstein to traffic innumerable, vulnerable young
15  women, to have them arranged for Mr. Epstein and
16  God knows whatever other powerful men in this
17  country whose names aren't being named to have sex
18  with these minors.  And she did that for years and
19  went to trial and has never shown an ounce of
20  remorse or any acceptance of responsibility.  She
21  was sentenced to 20 years in prison.  There's no
22  way Tristan's conduct is worse than Miss Maxwell's,
23  engaging in a years-and-years-long campaign of
24  trafficking, basically running a prostitution ring
25  except that, you know, the young girls aren't even

1  getting paid, and they're being abused as minors.

2      We had the Peters case from the Northern

3  District of Illinois where the defendant exploited

4  minors online, getting them to send him images and

5  then meeting several of them and forcing them into

6  sexual activity.  He was granted bond in federal

7  court and then fled to Canada and sought refugee

8  status to try and avoid responsibility for his

9  actions.  And even given all of that, he received

10  26 years in prison.

11      Tristan has accepted responsibility, pled

12  guilty, and done what he can to help law

13  enforcement.  I would submit to you he does not

14  deserve a sentence longer than what Mr. Peters

15  received.

16      He's 25 years old; he was 21 at the time of

17  his arrest.  The government's asking for a sentence

18  that's a decade longer than he'd been alive at the

19  time he was arrested.  And we throw these numbers

20  around -- 30 years, 20 years, 15 years.  They can

21  lose meaning.  Two decades is an incredibly long

22  period of incarceration.  Think back to 2002 and

23  whatever you were doing in November of 2002 and

24  then think everything that happened from that day

25  to this day being gone and you being in prison for

1    that entire period of time.  It is a harsh

2    punishment.  Now, it's a serious crime, and so

3    there's going to be a harsh punishment, but these

4    numbers are real, and they are real years in

5    prison, and I would submit putting Tristan in jail

6    for longer than he had been alive at the time of

7    the offense is not a sentence that is not greater

8    than necessary to achieve the goals of sentencing.

9        We would ask that Your Honor recommend to the

10   Bureau of Prisons that Tristan be housed either at

11   FCI Marianna -- and that's M-a-r-i-a-n-n-e (sic) --

12   which is in Florida, or FCI Petersburg in Virginia.

13   We have gone through, and Tristan has gone through

14   the B.O.P.'s list of various facilities.  They both

15   have sex offender management programs, and a review

16   of the vocational training that's available at

17   those institutions was what led to the selection of

18   those institutions.

19       And Mr. Blank would like to make a statement,

20   Your Honor.

21       THE COURT:  Okay.  Thank you.

22       Mr. Blank, will you please approach the podium

23   alongside your attorney?

24       Before I impose sentence, you have a right to

25   make a statement.  Do you wish to say anything?

1      THE DEFENDANT:  Yes, Your Honor.

2      THE COURT:  You may.

3      THE DEFENDANT:  Dear Your Honor, I would first

4  like to state that I take full responsibility for

5  all my actions and the damage that came from them.

6      I'd also like to apologize to the victims and

7  their families.  I'm sorry.

8      I would like to apologize to the community, my

9  family, and all others that have been hurt by me.

10  I hope that one day I may be able to eventually

11  right my wrongs and be forgiven by those I have

12  wronged.

13      For the benefit of the Court, I would like to

14  describe my past and possibly shed some light on my

15  situation.  I am by no means trying to shift

16  responsibility but instead merely trying to offer

17  insight into my situation.

18      From an early age, I have always felt like

19  less of a person and less loved than my brothers.

20  Not that there wasn't any love but more that it was

21  shown in amounts substantially smaller to that of

22  my brothers.  That, plus a level of sheltering that

23  I was subjected to which greatly limited and nearly

24  negated any chance to create friends, has created a

25  negative, depraved and unworthy self-image of

myself.  I started to question my own sexuality and
value at an early age and then began to struggle in
regard to that very issue.  I grew up in a culture
and environment in which a gay person would rather
die than be who they are.  I cried myself to sleep
on countless nights.  I wanted to run away but came
to the conclusion that I had nowhere to run to and
even created a chart cataloging and comparing ways
of suicide in regard to the factors of how painful
it would be and how long it would take.  I never
would have tried unless I knew it would work.  My
conclusion was to pull off the road on I-80 going
to Iowa, past Le Claire, and run in front of a semi
around the blank corner where a semi would be
speeding up going down, unable to do anything but
obliterate me.  That was the price for being gay.

I couldn't change it even though I tried, even
though I wanted to.  I was like the rule in George
Orwell's *Animal Farm* that stated, All animals are
created equal, but some animals are more equal than
others.

It was never self-evident to me that all men
were created equal.

Having no one to turn to, I made the horrible
decision to talk to individuals online about it,

feeling that it was my only option.  That decision
led me to talk to some individuals who were more
than willing to converse with me about my own
curiosities.  This progressed to a dangerous
situation in which I was being threatened in
numerous ways.  Being as naive and sheltered as I
was, I was too terrified and felt that I had no
choice but to comply.  This snowballed and led to
further bad, immoral actions.

This eventual progression led to me being
forced to create a false female persona, in which I
would be ordered to ask individuals -- some above
and some below the age of 18 -- to send images or
videos of a pornographic nature to satisfy my
antagonist.  I knew that what I was doing was
wrong, but my mind couldn't compute the extent of
how wrong it was.

I was always taught that you obeyed your
authority figure or you'd get in trouble.  My
undeveloped, cluttered mind wasn't able to look
that far past the fear and this concept to see the
bigger picture.  I should have reported this
situation to authorities, and on many occasions I
almost did, but he always found a way to keep me
from doing so.  I tried to get him to stop, trying

everything from blocking him to my trump card where
I would kill myself.  He would always find a way to
convince me otherwise.

My four years in county jail with no sunlight
or fresh air and just a concrete room surrounding
me has given me lots of time to think, mature and
process my situation and self.  I can now see and
understand the full gravity of everything.  I can
see how wrong my actions were and have come to
accept myself for who I am.  I have accepted that I
am gay, and it is okay.  I have come out to my
brothers and parents since I have been in Henry
County Jail.  I am no longer bound by the shackles
of fear and self-loathing which triggered my desire
to get online in the first place.  I don't know how
to describe that pain, and when I get out even --
and even during my incarceration, I want to help
others who are in the same struggle.  People
shouldn't feel worthless based on their sexuality
or feel so alone, having no one to turn to that
they have to get online to have a non-judgmental
conversation about their problems.

We all have problems.  The question is, Do we
have someone to help us through them, or are we
left alone to wrestle with our demons, praying it

1  will turn out all right?

2      It is my intention to take available classes

3  in prison to further both my education and

4  self-development.  I know at the age of 25 I have

5  so much to offer society as a whole.  Over the past

6  four years I have spent in county jail, I have

7  matured greatly, having seen the depths of

8  depravity that some individuals have dug

9  themselves.  I've examined myself and refuse to

10  give in to the fear and temptation anymore but

11  instead intend to learn to take my place in

12  society.  I would love to help others who are

13  struggling like I was and give them the tools to

14  overcome their situations before they ruin their

15  lives or, if they have already stumbled, I will

16  help pick them back up and put them back together

17  because everyone deserves a second chance.

18      I have already begun to try to start

19  rectifying my wrong, to both helping those I can

20  here in jail and cooperating with the FBI to help

21  catch the individual who was abusing me.

22      Yes, Your Honor, I did commit these crimes and

23  humbly request that all the factors be taken into

24  account.  I thank the Court for the opportunity to

25  speak, and again, I would like to apologize to the

1  victims and their family and the community, my

2  family, and all others who have been hurt as a

3  result of this.

4       Thank you, Your Honor.

5       THE COURT:  Thank you.

6       So, first I want to talk about the seriousness

7  of this offense conduct, and that is the driving

8  factor -- primary driving factor for the sentence

9  that I will be imposing.

10      Your guideline range is 150 years or the 1800

11 months.  There's the 15-year mandatory minimum on

12 each count.  The government's asking for a 30-year

13 sentence and then a 10 percent reduction upon that,

14 and your attorney is asking for something less.

15      The seriousness of this offense conduct is

16 really difficult to fathom and describe, and I look

17 at it from the damage that was caused.  There are

18 23 children whose lives are permanently altered

19 because of decisions you made.  And I understand

20 the facts in which -- or how this evolved and that

21 you, at the age of 17, became -- you were seeking

22 some type of contact, exploring your own sexuality

23 online because you didn't feel like you had those

24 avenues -- or you didn't have those avenues, it

25 appeared, in the way that healthy adolescent

1  relationships and sexuality is explored.  By

2  "healthy," I don't mean -- I don't take issue with

3  homosexuality or heterosexuality; I just mean in

4  normal social realms such as a high school setting

5  or a social interaction.  You, for many reasons

6  that are explained in the memo, were seeking those

7  types of -- that type of growth and exploration

8  online, and you found the individual in the U.K.

9  And I understand the relationship and the dynamic

10  that you engaged with with him.  I just don't find

11  it mitigating.  And I don't find it mitigating

12  because you didn't need to then emulate the

13  damaging conduct that he had shown to you in

14  spreading that harm to other individuals.

15      He had this like weird dynamic -- this

16  interesting dynamic in terms of control,

17  manipulation, slave/master, and then using coercive

18  means to get what he wanted which was control, it

19  appeared, but also images and video.  I don't see

20  those same hints of this control, master/slave

21  dynamic necessarily in the way that you victimized

22  the children in this case, but certainly you used

23  many and a majority of the tactics that you

24  witnessed in your interaction with him in carrying

25  out the crimes in this case.

1    And those are devastating.  You sexually

2   assaulted -- I would call it rape, but you sexually

3   assaulted two minor children, and the manner and

4   means in which you did that was through using

5   threats and coercion.  And the scope and scale of

6   the damage caused here because of your criminal

7   behavior is, frankly -- I've had -- unfortunately,

8   I've had many cases with this type of offense

9   conduct.  I've never had this many victims.

10   There's 23 victims here, 2 of whom you physically

11   assaulted.

12    And the manner in which you committed this

13   offense that I find so serious is that you preyed

14   upon individuals who were vulnerable.  They were

15   vulnerable because they knew you.  They were

16   vulnerable because they knew -- some of them knew

17   you either as a friend through a work environment

18   or, worse, in a role of authority that you abused

19   in a coaching dynamic.  They were vulnerable

20   because you actually targeted many of them because

21   they were athletes or a little bit more well-known

22   in the community or you were able to find them in

23   your target age group and type through media

24   because of their athletic accomplishments.  They

25   were vulnerable because of their age; we're talking

1    about 13-year-olds, 14-year-olds, 15-year-olds.
2    And then they're vulnerable because, at that age,
3    they were vulnerable to communicating with you in
4    the first place.  They were vulnerable because you
5    were deceptive about who you were; you posed as a
6    woman.  And then they were vulnerable because you
7    preyed upon their concern as a child to not be
8    exposed -- their initial activities with you be
9    exposed to their parents.  They didn't want -- I
10   mean, that's a child.  A child's whole world is
11   often -- should be -- is often their parents at
12   that age, and what their parents think of them
13   means everything to them.  It's an outsized
14   perspective at that age than perhaps an older adult
15   has, and so, therefore, that magnifies the threats,
16   threats that you engaged in with them.
17        So, your M.O. with these individuals and what
18   you learned under the tutelage of the -- S.W. in
19   the U.K. was to pose as somebody that these
20   individuals would be more likely to interact with,
21   and that was a girl, get them -- in very
22   descriptive terms basically order them, talk them
23   through the types of sexually explicit poses that
24   you wanted them to engage in and send to you either
25   by video or by image, by stills, and those were for

1   your sexual gratification.  And then you

2   blackmailed them.  There's no other way to say it.

3   You blackmailed them and preyed upon those

4   vulnerabilities that I described, and threatened to

5   send those images -- those compromising images to

6   their friends, to their family, and to the public.

7       And so because of that threat -- those

8   threats, some of them engaged in -- it's not

9   consensual.  It's not consensual because of the

10  age, and it's not consensual because of the

11  coercive nature but to engage in sexual encounters

12  with you out of fear.  That's what it was.  You

13  preyed upon their fear for your own sexual

14  gratification.  Regardless of the motivations,

15  regardless of any of that, that's the real thing

16  that happened.  That's the damage.  That's the

17  harm.  And that is permanent.

18      I hope that they will be able to work through,

19  in varying levels, through the support of their

20  families, through therapy, through professional

21  intervention, through age, be able to work through

22  the harm, but it's still always going to be there,

23  the way that you made them feel, the damage that

24  you caused to them.  And there are 23 of them, 2 of

25  whom you raped, and the others that you engaged in

1   this behavior with.  That's 23 individuals whose
2   lives are permanently impacted because of your
3   action in this case.  That is not, I think, fully
4   accounted for with the sentence of 30 years.  It
5   just isn't.

6       A variance is in order for many reasons.  150
7   years is a life sentence.  I don't intend to give
8   you something that's the functional equivalent of a
9   life sentence, but you, in many ways, have given a
10  life sentence to these 23 children that you have
11  left a permanent imprint upon their lives, and that
12  needs to be addressed in a way that I don't think
13  this guideline range and the, the way that -- well,
14  the guideline range is more than necessary, but the
15  way that the specific offense characteristics are
16  applied, 30 years is not enough to address that
17  harm.

18      Your personal history and characteristics.
19  You don't have any criminal history.  That's very
20  common in cases like this.

21      You yourself have provided an explanation for
22  why you initially engaged in looking at the
23  internet and then maybe even developing the
24  contacts that you did in a desperate attempt to
25  explore your sexuality at the expense of the

1  well-being of children, but taking it to that next
2  level, the sophistication of the way that you did
3  it, the deceptive nature of pretending to be a
4  woman, the targeting upon the individuals through
5  either your association with them of coaching or
6  just in the community or through work, the manner
7  in which you directed them.  And this went on for
8  almost two years, and some of the relationships
9  that you had with these individuals or some of this
10 interaction went on, at times, for four months.
11 This isn't just aberrant behavior.  This was what
12 you were engaged in from April of 2016 until you
13 got caught, and who knew when it was going to end.
14      So, maybe it explains why at the beginning you
15 were exploring things on the internet, but it in no
16 way, I find, is a correlating mitigating factor in
17 relation to the severity of the conduct here.
18 Sometimes there's an explanation, but not an
19 excuse.
20      I do think -- so, I don't find -- I have to be
21 able to find, I think, a connection between your
22 personal history and characteristics and how they
23 might be mitigating, how they might mitigate some
24 of the other aggravating factors as I found here or
25 even just the more neutral factors.

1    Here, I do think that what your attorney is
2  arguing in mitigation supports a variance.  Again,
3  we're talking -- I mean, it's not lost on me the
4  magnitude of these numbers at all, but anything I
5  give you today, even if it's above the 30, is a
6  variance.  It's a dramatic variance from the
7  guidelines.  But I do think there is a correlation
8  between what your attorney is arguing in mitigation
9  to your risk to re-offend.  That's balanced out by
10 the fact that you have a higher risk to re-offend
11 in my mind because you were hands-on.  You actually
12 assaulted these individuals.  You carried it all
13 the way through to the end and created the worst
14 kind of harm that we hope to avoid here, and so
15 that puts you at a higher risk to re-offend, but I
16 do think that you finally addressing a lot of your
17 own struggles and issues and development can help
18 reduce that risk to re-offend.
19    Your age is a very high mitigating factor.
20 You've been involved with this for a while.  You
21 became involved with, with the individual in the
22 U.K. at the age of 17, and then you were still in
23 early -- well, some say adolescence for males lasts
24 until 24.  You were in that target window while you
25 were engaging in this behavior and put within the

context of what's been described with your
upbringing and the isolation and the non-accepting
environment, that kind of even reduces your real
maturity from your chronological age.  And I do
think that your age is the driving mitigating
factor here and offsets what I think might
otherwise be an even higher sentence necessary to
reflect the seriousness of the offense conduct.

I disagree with the disparity arguments, at
least the two examples that are presented by the
defendant in the briefing.  Ghislaine Maxwell,
that's -- first of all, the guideline range was
much lower; it was like 188 to 235 months, I
believe.  Her role, while, you know, really
serious, was a different type of role that she had
in her offense than you did.  The victim -- there
might have been more victims, but in terms of her
relative culpability and the role in that offense
and the resulting guideline range, I don't think
that it's a suitable comparison.

And then the Peters case had -- is closer
factually, and, obviously, he does not have --
neither of the comparators have the same level of
acceptance of responsibility -- which I'll address
in a minute -- that you do.  Maxwell went to trial,

1  and Mr. Peters absconded while on bond to another
2  country but had, I believe, 7 victims as opposed to
3  your 23, 2 of which he also physically sexually
4  assaulted, which is comparable here.

5      So, I mean, the gravity of -- the sheer
6  magnitude because of the -- what I've already
7  described and the number of victims here needs to
8  be addressed and reflected to avoid an unwarranted
9  sentencing disparity, not just within the country
10 but also within my own sentences that I've imposed
11 for similarly situated individuals who received
12 sentences similar to what the government is
13 recommending but had one or two victims with the
14 same type of conduct.

15     I do think that there is room for a general
16 deterrent argument here.  It is tempered by the
17 argument that your attorney has made that getting
18 caught seems to be the biggest deterrent factor, I
19 think, caught and prosecuted for this type of
20 offense conduct, but to know that you will face
21 something more than the mandatory minimum is
22 important.  I'm not disillusioned or naive enough
23 to think that there's a significant impact -- or
24 difference in the impact of a sentence within a
25 few-year range or even maybe even a decade, but I

do think it's important.  That's why it's important
that these sentences are released to the public and
the media so they are aware of the severe
consequences that could pose when a deliberate
decision is made to go down this path.

I do think that this goes to the
rehabilitation argument.  I do think the acceptance
of responsibility that you have shown is that
you've done everything that you could do.  You
cooperated and assisted the authorities, and you
should be -- you should receive credit for that
because, because of your assistance, hopefully
other victims -- there won't be additional victims
because you assisted in helping with the
investigation of the individual in the U.K.  And
that not only is why you're getting a 10 percent
reduction in the sentence that I think is otherwise
appropriate in this case, but also that goes to
support consideration of the degree in which you've
accepted responsibility, and I do think that
there's a strong correlation between how somebody
demonstrates their commitment to accepting
responsibility to a risk in recidivism because
somebody who truly accepts responsibility and
understands the harm that they caused and is

1   willing to address maybe some of the root issues
2   that caused them to engage in that conduct in the
3   first place is somebody who shows a much greater
4   rehabilitation potential than people who act
5   differently.

6        And you have a very high level of
7   intelligence.  That's demonstrated not just by your
8   allocution today but throughout the record and the
9   memorandum and letters from your loved ones.  So,
10   you have the ability for that introspection that
11   you've displayed here today and to continue on with
12   treatment and hopefully never be in a position
13   again where you put others at risk.

14        I think that given all of the 3553(a) factors
15   that I've described and before application of the
16   10 percent reduction that a sentence of 36 years is
17   the appropriate sentence in this case.  Applying a
18   10 percent reduction would reduce it by four years
19   and bring it down to your final sentence that will
20   be imposed which is a 32-year sentence.  I believe
21   that's a 384-month sentence.

22        Have you reviewed all of the proposed
23   conditions of supervised release with your client,
24   Mr. Patton?

25        MR. PATTON:  Yes, Your Honor.

1        THE COURT:  Do you have any objection to the
2   imposition of those conditions?
3        MR. PATTON:  No.
4        THE COURT:  Do you waive reading of the
5   imposition of those conditions in open court?
6        MR. PATTON:  Yes.
7        THE COURT:  Pursuant to the Sentencing Reform
8   Act of 1984, you are hereby committed to the
9   custody of the Bureau of Prisons for a period of 32
10  years.  Said term shall consist of 360 months on
11  Counts I through IV and a consecutive 24 months to
12  be served on Count V.
13       I find that you do not have the ability to pay
14  a fine, and no fine nor the JVTA assessment are
15  imposed.
16       Following your release from custody, you shall
17  serve a lifetime supervised release term.  While on
18  supervised release, you shall not commit another
19  federal, state or local crime.  You shall not
20  possess a controlled substance.  You shall submit
21  to one drug test within --
22       Can I waive the drug testing on this type of
23  offense?
24       MR. PATTON:  If you make a finding that he
25  doesn't have any --

1    THE COURT:  Is there any objection to waiving

2 the drug testing?  There's absolutely no indication

3 in the record of any drug use.

4    MS. SEBERGER:  I don't have an objection, Your

5 Honor.  I don't know if there's a way to craft it

6 so that if something were to pop up, Probation

7 would have the ability to --

8    THE COURT:  They can always seek a

9 modification of his conditions of supervised

10 release.

11    I'm waiving drug testing as a term -- as a

12 condition of supervised release and under the

13 statute.  So, that condition -- he's not to possess

14 any controlled substances, but the statutory drug

15 testing is waived.

16    Pursuant to statute, you shall cooperate in

17 the collection of DNA as directed.

18    You shall comply with the requirements of

19 SORNA, which is the Sex Offender Registration and

20 Notification Act, as directed.

21    All of the other proposed conditions of

22 supervised release are hereby imposed.

23    A special assessment of $500 is imposed,

24 payable immediately.

25    I'll recommend that you serve your sentence in

1   a facility that will maximize your exposure to the
2   sex offender treatment program as well as other
3   educational and vocational opportunities, with a
4   specific recommendation for placement either at FCI
5   Marianna or FCI Petersburg.
6        I will enter an order of forfeiture.
7        Were there appellate waivers?
8        MR. PATTON:  Yes.
9        THE COURT:  At the time that you pled guilty,
10  you waived many but not all of your rights to
11  appeal.  To the extent you wish to appeal the
12  sentence in this case, you have 14 days to do so.
13  If you notify Mr. Patton within the next 14 days of
14  a desire to appeal, then he has an absolute duty to
15  file that appeal on your behalf.
16       Do you understand?
17       THE DEFENDANT:  Yes, Your Honor.
18       THE COURT:  Is there anything further on
19  behalf of the government?
20       MS. SEBERGER:  No, Your Honor.
21       THE COURT:  Mr. Patton, anything further?
22       MR. PATTON:  No, Your Honor.
23       THE COURT:  Good luck to you, sir.
24       We'll be in recess.
25       COURTROOM DEPUTY:  Court is in recess.

1        (Proceedings concluded at 12:23 p.m.)

2

3

4

                 CERTIFICATE OF OFFICIAL REPORTER

5

6

7        I, Jennifer E. Johnson, CSR, RMR, CBC, CRR,
    in and for the United States District Court for the
    Central District of Illinois, do hereby certify
8   that pursuant to Section 753, Title 28, United
    States Code that the foregoing is a true and
9   correct transcript of the stenographically reported
    proceedings held in the above-entitled matter and
10  that the transcript page format is in conformance
    with the regulations of the Judicial Conference of
11  the United States.

12       Dated this 20th day of December, 2022.

13

14                    /s/ Jennifer E. Johnson
                      JENNIFER E. JOHNSON
15                    CSR, RMR, CBC, CRR
                      License #084-003039

16

17

18

19

20

21

22

23

24

25